IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CRAIG MATOSICH, | CV 19–16–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| WRIGHT MEDICAL GROUP, INC.; WRIGHT MEDICAL TECHNOLOGY, INC.; and DOES 1–10, | |
| Defendants. | |

Before the Court is Plaintiff Craig Matosich's Motion to Compel.  (Doc. 41.) Matosich asks the Court to Order Defendant Wright Medical Technology, Inc. ("Wright") to produce: (1) various documents connected to other, similar lawsuits; (2) a spreadsheet compiling information about hip implant fractures similar to that which is at the heart of this lawsuit; and (3) reports demonstrating Wright's analysis of the risks associated with the hip implant.  A hearing on the motion would not aid in its resolution.  The Court grants the motion in part and denies it in part.

## BACKGROUND[1]

Plaintiff Craig Matosich underwent hip replacement surgery in October 2008, when he was 38 years old.  (Doc. 1.)  He and his doctor selected Wright's Profemur system, including the Profemur Z titanium femoral stem, for his surgery. (Doc. 1.)  Matosich was able to resume most activities by January 2009, and he continued to do well with the implant for nearly a decade.  (Doc. 1 at 6.)

On September 4, 2017, though, Matosich's right leg suddenly gave out while he was in his home.  (Doc. 1 at 6.)  At the hospital, x-rays revealed that the Profemur Z femoral stem had snapped in half.  (Doc. 1 at 6.)  Matosich underwent a six-hour hip revision surgery on September 6, 2017, during which the Profemur system was replaced with other manufacturers' implant components.  (Doc. 1 at 7.) The surgery was difficult: because the broken device had lodged into the bone, the surgeon had to break Matosich's femur.  As of the filing of his Complaint in January 2019, Matosich was not yet fully recovered from the failure of the implant and the revision surgery.  (Doc. 1 at 7.)

Matosich brings five claims against Wright, all under Montana law: (1) strict products liability; (2) failure to warn; (3) breach of warranty; (4) violation of the

---

[1] Strictly for purposes of determining discoverability, the background section of this Order is derived from the allegations of the Complaint.

Montana Consumer Protection Act; and (5) negligence.  (Doc. 1.)  He also seeks

punitive damages.  (Doc. 1.)

## LEGAL STANDARD

Rulings on discovery issues fall within the Court's broad discretion over

case management.  *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988).  The

scope of discovery extends to all

> nonprivileged matter that is relevant to any party's claim or defense and
> proportional to the needs of the case, considering the importance of the
> issues at stake in the action, the amount in controversy, the parties'
> relative access to relevant information, the parties' resources, the
> importance of the discovery in resolving the issues, and whether the
> burden or expense of the proposed discovery outweighs its likely
> benefit.

Fed. R. Civ. P. 26(b)(1).  For purposes of discovery, relevance is relatively

expansive, "encompass[ing] any matter that bears on, or that reasonably could lead

to other matter that could bear on, any issue that is or may be in the case."

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).   But a court may

act to limit unreasonably cumulative, overbroad, unduly burdensome, or irrelevant

discovery.  Fed. R. Civ. P. 26(b)(2)(c).

A party may move to compel disclosure when it is unable to access

information through its discovery requests.  Fed. R. Civ. P. 37(a)(2)(A).  "The

moving party bears the burden of showing that the discovery sought is 'relevant' as

defined above, and the party resisting discovery bears the burden of showing that

nondisclosure is appropriate." *Cintron v. Title Fin. Corp.*, 9:17-cv-108-M-DLC, 2018 WL 6605901, at *1 (Dec. 17, 2018). This Court "takes an expansive view regarding relevance for purposes of discovery. At risk of stating the obvious, subject matter or documents may be relevant, as defined in the preceding paragraphs, for purposes of discovery, but will not meet the more stringent standard of relevance to constitute admissible evidence at trial." *Id.* at *1.

## DISCUSSION

Matosich argues that Wright failed to produce documents responsive to three requests for production. First, he asked for "cloned discovery"—materials developed during the litigation of other cases involving the same or similar devices. Second, he requested a spreadsheet, which he claims Wright maintains, compiling information about modular neck fractures in Wright devices. And third, he asked Wright to produce "Profemur Risk Analysis reports," which the Court understands to mean documents showing Wright's assessment of the risks of its Profemur products. Before addressing the merits of these requests, the Court considers—and rejects—Wright's position that the Court should deny Matosich's motion in its entirety because he waited too long to file it.

The Court agrees that Wright should produce any documents responsive to the second and third requests. However, it determines that, with two relatively narrow exceptions, the cloned discovery request does not merit compelled

production.  Because the relief granted is modest, and because Wright's position was not unjustified, the Court does not award fees and costs.

## I.    Delay in Bringing Motion

Wright contends that the Court can and should refuse to consider Matosich's motion to compel because he did not file it until shortly before the discovery deadline.  The Court disagrees that Matosich's motion—filed on February 12, 2020, nearly six months prior to the start of trial—was untimely filed.

Wright cites to other jurisdictions to suggest that a motion to compel should be denied as untimely when it is filed shortly before the close of discovery.  However, individual trial courts have great discretion over pretrial proceedings, and the Court is not particularly concerned with other courts' case-management styles.  Additionally, the facts presented here are distinguishable from those of the cases Wright cites.  *See, e.g.*, *West v. Miller*, No. 05C4977, 2006 WL 2349988, at *6 (N.D. Ill. Aug. 11, 2006) (filing of motion eleven days prior to close of discovery "not enough for this Court [to] cry 'too late,'" but undue delay found based on other indications that party seeking disclosure was playing discovery games and refusing to accept reasonable compromises).

Moreover, although the Court expects all parties to work cooperatively to complete discovery in a timely manner, it also understands that the discovery process often does not have a tidy conclusion.  In the undersigned's experience as a

trial lawyer and judge, it is not uncommon for parties to continue to share materials on the eve of—or even over the course of—trial.  Thus, the Court has clearly communicated to the parties that they may extend the discovery deadline without court intervention.  (Doc. 28 at 3.)

Wright does not suggest that the fairness of trial in this matter will be compromised by any court-ordered production of documents, only that it may "result in 'protracted discovery, the bane of modern litigation'" and "burden" the Defendant "with discovery tasks while having to comply with the remainder of this Court's deadlines."  (Doc. 43 at 9.)  These arguments fall far short of convincing the Court that it should dismiss Matosich's motion out of hand.  This case will be litigated on its merits, and if more discovery is necessary to ensure a fair process and result, then more discovery will be ordered.

## II.    Cloned Discovery

The most significant dispute between the parties is whether Wright must produce materials created during litigation of other Profemur customers' claims against Wright.  Relevant here is a single request for production, which reads:

> **Request for Production No. 30:**  For each lawsuit that has been filed against Wright Medical Technology, and its predecessor or related companies, which involves the fracture of a Profemur titanium modular neck implant device similar to that which was implanted in Plaintiff, please produce the following:
>
> 1. The Complaint, Petition, or other charging document that was filed to initiate the lawsuit;

2. Wright Medical Technology's Answer or Response to the lawsuit;

3. Reports from Wright Medical Technology's experts that were done in accordance with Rule 26, Fed.R.Civ.P.;

4. Reports from Plaintiff's experts that were done in accordance with Rule 26, Fed.R.Civ.P.;

5. Depositions taken by defense counsel of Plaintiff;

6. Depositions taken by defense counsel of Plaintiff's experts;

7. Depositions and any related videos taken by Plaintiff's counsel of Wright Medical Technology's experts;

8. Depositions and any related videos taken of Debby Daurer, Tara Whittaker, Bryan Callahan, Rob Behrens, Stephanie Valk, and Susan Anderson;

9. Depositions and any related videos of witnesses designated by Wright Medical Technology, Inc. as Rule 30(b)(6) witnesses to speak on behalf of the corporation;

10. Depositions taken of any other person who Wright Medical Technology, Inc. intends to call to testify at trial or identifies as a witness in this case.

(Doc. 42-1.) Wright objected, stating:

Wright Medical Objects to this improper request for cloned or "piggyback" discovery. This overly broad, unduly burdensome, and disproportionate blanket demand for essentially all prior discovery in other actions is inconsistent with Federal Rule of Civil Procedure 26. It would be a Herculean task to simply review and redact the exorbitant number of documents this Request seeks for confidentiality pursuant to prior protective orders, HIPAA, and state privacy laws. And the time and expense of doing so is disproportionate to the needs of the case, particularly where Plaintiff's allegations stem from the fracture of a

PROFEMUR® Titanium Neck, which is a known risk of having hip surgery.

(Doc. 42-1.)

Wright assures the Court that it "does not deny the existence of fractures" and has, in fact, produced thousands of pages of what it calls "Complaint Files" regarding these fractures. "[C]reated each time Wright received notice of a fracture," Complaint Files were updated with photographs and study findings upon Wright's receipt of the device. (Doc. 43 at 12.) However, Wright objects to production of litigation materials from other cases arising from failures of the same or similar devices, arguing that the materials are outside the scope of discovery, unduly burdensome, irrelevant, and duplicative, and that production would violate protective orders issued by other courts.

As a preliminary matter, the Court disagrees with Wright's framing of its objection regarding relevance. For purposes of discovery, Federal Rule of Evidence 401 does not apply; nor do trial standards for the admissibility of hearsay evidence. (*See* Doc. 43 at 13–14.) The standard for discoverability is immediately distinguishable—and far broader. As this Court recently wrote, "if the information sought might reasonably assist a party in evaluating the case, preparing for trial, or facilitating settlement, it is relevant to the subject matter involved in the pending action." *Cintron*, 2018 WL 6605901, at *1 (quotation omitted). The information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

8

Although the Court does not agree with how Wright presented its arguments, it nonetheless agrees on the merits. Most of the information sought is not reasonably likely to aid in resolution of this case on its merits. *Id.* Because Wright has already produced information regarding all known fractures in the form of the Complaint Files, it is unclear what benefit will arise from litigation documents developed in cases involving other patients, distinguishable law, and potentially different medical devices. Given the volume of other cases in play—which Wright estimates at over 300—the Court agrees that any potential benefit is outweighed by the economic and time burdens that Wright would surely incur if it were required to produce all responsive complaints, answers, reports, and depositions.

That said, the Court finds that there is a small number of responsive, relevant documents which can be produced with minimal burden and expense. First, the Court notes that Matosich claims to "have no idea how Wright came up with 300 or more cases since it refused to answer Matosich's interrogatories asking for the names of other lawsuits." (Doc. 44 at 11.) Matosich is entitled to this information, but only as to those lawsuits involving a fracture of the same component that allegedly failed in this case. Wright shall produce a list or spreadsheet that includes the caption, jurisdiction, and docket number of each lawsuit meeting this criterion. If he wishes to seek further information about the cases, Matosich may access the dockets himself.

9

Second, to the degree that Wright may rely on experts in this case who have previously testified on Wright's behalf in cases involving fractures of the same component, Wright shall produce those experts' reports and deposition transcripts from such cases—redacted, as necessary, to protect private health information.[2] This is a finite category of materials, and it is relatively well-calculated to lead to impeachment evidence.  Further, the Court notes that, under Rule 26(a)(2)(B)(v), an expert report must include "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition."  Thus, these materials should be fairly easy to identify and locate.

The Court otherwise denies Matosich's motion, which is primarily supported by other, recent cases against Wright.  Two of these cases do not involve similar requests for cloned discovery.  Rather, the plaintiffs sought documents regarding the design and fracture rates of Wright's hip implant systems—materials that Wright has already produced (presumably because it maintains a consistent approach to discovery in lawsuits similar to Matosich's).  In one case, the court ordered production of "the design and regulatory files for the entire titanium neck product line and documents related to the fractures in the titanium long neck . . . ."

---

[2] Aside from protected private health information, the Court is unconcerned with protective orders issued by other courts to the degree that those orders were entered to protect Wright, not third parties.  A party cannot use a protective order, granted as a benefit to that party, to shield itself from discovery.

*Bower v. Wright Medical Technology, Inc.*, No. 2:17-cv-03178-CAS (KSx), 2018 WL 6330410, at *4 (C.D. Cal. Dec. 3, 2018).  The other case involved a similar remedy—the production of responsive documents, "only with respect to neck 'fractures' (not any other form of device 'failure') . . . , including without limitation design and testing files, device history records, complaint files, regulatory files, [and] post-market surveillance report[s] relating to [the specific device]." *Biorn v. Wright Med. Tech. Inc.*, No. CV 15-7108-CAS (KSx), 2017 WL 10434388, at *5 (C.D. Cal. Jan. 25, 2017).

*Costa v. Wright Medical Technology, Inc.* offers more support for Matosich's position, but there the court only compelled production of materials from one other case.  No. 17-cv-12524-ADB, 2019 WL 108884 (D. Mass. Jan. 4, 2019)  In *Costa*, the District of Massachusetts court noted that "[s]o-called cloned discovery is often attractive to litigants because it can reduce the burden and expense of obtaining relevant information and help the parties narrow the issues in dispute more rapidly than they otherwise could." *Id.* at *1.  Primarily citing to cases within the district, the court applied a rule that "[m]aterials produced and deposition testimony given in other litigation is generally discoverable upon a showing of substantial similarity between the prior and current actions." *Id.* (quoting *Town of Westport v. Monsanto Co.*, No. 14-12041-DJC, 2015 WL 13685105, at *3 (D. Mass. Nov. 5, 2015)).

11

However, that court found that only one prior action involved a fracture of the same component and therefore met the standard of substantial similarity. *Id.* at *2. Thus, while the court ordered the production of certain cloned discovery materials, the burden on the defendant was light. Here, even assuming that the Court would otherwise follow the approach laid out in *Costa*, the cost-benefit analysis tips in the other direction.

The Court **grants in part** the motion as to Request for Production 30. Wright shall produce:

(1) A list of all cases, including the caption, jurisdiction, and docket number, involving a fracture of the **same** device at issue in this lawsuit; and

(2) Expert reports and deposition transcripts of experts that may be called in this case, but only as to those cases involving a fracture of the **same** device, redacted as necessary to protect private health information.

The Court otherwise **denies** the motion as to Request for Production 30.

## III.    Modular Neck Fractures Spreadsheet

Matosich asks the Court to compel production of a legible spreadsheet compiling data regarding fractured devices. The relevant request reads:

> **Request for Production No. 31:** Please produce your most complete and up to date Modular neck fractures spreadsheet.

(Doc. 42-1 at 4.) Wright objected on the grounds that the request was: (1) "overly broad and vague"; (2) "not limited in time or scope"; and (3) unclear. (Doc. 42-2

at 4.)  However, it appears that Wright did, in fact, produce the document sought by Matosich—just in an illegible format, with an unreadably small font in a low-resolution image.  (*See* Doc. 44-9.)

As evidenced by the production of this spreadsheet, albeit in an unusable form, the spreadsheet exists and is discoverable.  If there was any legitimate dispute about the clarity of Matosich's request, it is clear now what he was seeking.

The Court **grants** the motion as to **Request for Production No. 31**.  If Wright has not yet produced an up-to-date, legible version of the spreadsheet attached as an exhibit to Matosich's reply brief (Doc. 44-9), it must do so now.

## IV.    Risk Analysis Reports

Finally, Matosich seeks documents analyzing the risks of Profemur medical devices.  The request reads:

> **Request for Production No. 32:**  Please produce complete copies of all Profemur Risk Analysis reports.

(Doc. 42-2 at 4.)  Wright responded:

> Wright Medical objects to this Request as overly broad and vague ("Profemur Risk Analysis reports").  Subject to and without waiving its objections, as it relates to documents that address risks associated with implantation of a PROFEMUR® Titanium Neck, Wright Medical direct[s] Plaintiff to . . . the Instructions for Use that was enclosed with the PROFEMUR® Titanium Neck implanted in Plaintiff's hip . . . , the Device Development File . . . , the Device History File . . . , and more generally, to the Product Post-Market Surveillance, Development, Testing, Investigation, and Complaint Files produced by Wright Medical and identified on the corresponding Index.

(Doc. 42-2 at 4–5.)

Included within the "Device History File" was a 2007 document entitled "Risk Analysis for PROFEMUR® Hip Implants developed at Wright Medical Technology and Wright Medical Europe, divisions of Wright Medical Group Company." (Doc. 44-13.) Matosich contends that "[t]here are presumably others which Wright has not produced or identified as having been produced. Wright, therefore, should be ordered to produce not only the lists [i.e., the spreadsheet addressed above] but the risk analyses that it has done for each fracture." (Doc. 44 at 16.) Wright replies that "there is nothing to compel," as it has produced all responsive documents.

It is not clear whether other documents, similar to the "Risk Analysis" document already produced, exist.[3] If so, they should be produced now. Wright's assessment of the risks of the Profemur implants is relevant to Matosich's claims regarding Wright's alleged failures to: provide a safe product, warn of or otherwise truthfully disclose the product's risks, comply with Montana's Consumer Protection Act, and exercise reasonable care.

---

[3] The Court is somewhat concerned that Wright does not classify the 2007 document as a "risk analysis report." Whether or not a document has that precise title—which would be impossible for outsiders such as Wright and his attorney to ascertain—it is clear enough that this document fits the bill.

14

However, the Court notes that, contrary to Matosich's position, it finds it highly unlikely that Wright would conduct a "risk analysis" for each fracture after the fracture occurred. Perhaps Wright's analysis of the risks associated with Profemur devices changed as reports of fractures came in. If this is true, it should produce any and all documents detailing such changes that have not already been produced.

The Court **grants** the motion as to **Request for Production No. 32**, but only as to any evidence detailing Wright's assessment of the risks associated with the Profemur hip implant system. The Court lacks information regarding and therefore takes no position on whether any such documents exist and have not yet been produced.

## V.    Fees and Costs

Pursuant to Federal Rule of Civil Procedure 37(a)(5), the Court "must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees" unless "the opposing party's nondisclosure, response, or objection was substantially justified" or "other circumstances make an award of expenses unjust." "If the motion is granted and part and denied in part, the court . . . may,

15

after giving an opportunity to be heard, apportion the reasonable expenses for the motion." Fed. R. Civ. P. 37(a)(5)(C).

The Court finds that an award of fees and expenses would be unjust in this case. To the degree that Wright did not produce documents responsive to Requests for Production 31 and 32, nonproduction appears to be primarily attributable to miscommunication between the parties—for which both parties bear responsibility. As for Request for Production 30, the relief granted is narrow, and the Court finds that Wright's position "was substantially justified," as evidenced by other courts' rulings against or limiting the scope of cloned discovery. *See, e.g.*, *Cont'l Cas. Co. v. J.M. Huber Corp.*, No. CV 13-4298 (CCC), at *2–3 (D.N.J. June 27, 2016); *Town of Westport*, 2015 WL 13685105.

Accordingly, IT IS ORDERED that the motion (Doc. 41) is GRANTED IN PART and DENIED IN PART, as outlined in the body of this Order.

IT IS FURTHER ORDERED THAT:

(1) Wright shall produce materials responsive to Matosich's Requests for Production 31 and 32 on or before May 14, 2020;

(2) Wright shall produce a list of related cases on or before May 14, 2020; and

(3) Wright shall produce expert reports and transcripts on or before May 28, 2020.

16

DATED this 7th day of May, 2020.

Dana L. Christensen, District Judge
United States District Court